# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT S. WEINER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 9671-VCP |
| | ) | |
| MILLIKEN DESIGN, INC. f/k/a | ) | |
| SYLVAN CHEMICAL CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 15, 2014
Date Decided: January 30, 2015

Kevin R. Shannon, Esq., Matthew J. O'Toole, Esq., Christopher N. Kelly, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Steven M. Kushner, Esq., FELLOWS LABRIOLA LLP, Atlanta, Georgia; *Attorneys for Plaintiff.*

R. Judson Scaggs, Jr., Esq., Leslie A. Polizoti, Esq., Christopher P. Quinn, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Troy A. Tessier, Esq., Greenville, South Carolina; *Attorneys for Defendant.*

**PARSONS, Vice Chancellor.**

Before the Court are cross motions for summary judgment, one seeking to compel arbitration of a post-closing price adjustment pursuant to a stock purchase agreement, and the other seeking to limit the scope of that arbitration. In particular, the defendant, a Delaware corporation, contends that certain issues identified by the plaintiff, an individual formerly employed by that corporation, are not arbitrable under the relevant agreement. The plaintiff contends that the defendant's objections actually go to questions of procedural arbitrability and should be decided by the arbitrator. For the reasons stated herein, I agree with the plaintiff and refuse to limit the issues the arbitrator will decide in the manner requested by the defendant. The parties also disagree about who should serve as the arbitrator, and espouse different interpretations of the relevant contract provision. On this point, the parties are directed to submit up to three candidates each who would be qualified based on the parameters I have specified in this Memorandum Opinion.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff and Counterclaim Defendant, Dr. Robert S. Weiner, is an individual residing in Georgia. Defendant and Counterclaim Plaintiff, Milliken Design, Inc. ("Milliken"), is a Delaware corporation formerly known as Sylvan Chemical Co., Inc. Milliken is a privately held textile, chemical, and floor covering company based in Spartanburg, South Carolina.

---

[1] Except as otherwise noted, the facts are drawn from the well-pled allegations of Weiner's Verified Complaint to Compel Arbitration (the "Complaint").

1

## 1.     The Agreement

In October 2009, Milliken entered into a Stock and Unit Purchase Agreement (the "Agreement")[2] to acquire several entities owned by Dr. Weiner and his former business partners: (1) Lineage PCR, Inc., a Delaware corporation ("Lineage PCR"); (2) PCR Holdings, LLC, a Delaware limited liability company ("PCR Holdings"); (3) Product Concepts Residential, LLC, a Georgia limited liability company ("Product Concepts"); and (4) Constantine Dyeing, LLC, also a Georgia limited liability company (collectively, the "Acquired Companies").[3]   Product Concepts, which the Agreement defined as the "Operating Company,"[4] formerly did business as Constantine Carpet.[5]   Before the acquisition, Product Concepts and Constantine Dyeing, LLC were subsidiaries of PCR Holdings, which, in turn, was partly owned by Lineage PCR.

PCR Holdings and Lineage PCR were held by two groups that, together, comprised the "Sellers" under the Agreement: (1) the "Legacy Owners," which include Dr. Weiner and several other entities and individuals; and (2) the "Lineage Owners," which include a Delaware limited partnership, Lineage Capital, L.P., and a Delaware

---

[2]     Compl. Ex. A [hereinafter "Agreement"].  Capitalized terms not defined herein are used as defined in the Agreement.

[3]     Agreement § 1 (defining "Acquired Companies").

[4]     *Id.* § 1.

[5]     Affidavit of Simeon Skinner ("Skinner Aff.") ¶ 5.

limited liability company, Lineage Investors, LLC.[6] The Legacy Owners directly held membership interests in PCR Holdings. The Lineage Owners were the stockholders of Lineage PCR, and thereby had an indirect interest in PCR Holdings.

Pursuant to the Agreement, Milliken purchased the Acquired Companies by acquiring all of the outstanding shares and interests of Lineage PCR and PCR Holdings.[7] As consideration, Milliken agreed to pay the Sellers roughly $30 million in cash and to assume roughly $16 million of the Acquired Companies' net debt. That $46 million figure potentially could be adjusted by a "Net Working Capital Adjustment" and certain "Earnout" payments to yield the total "Purchase Price."[8] Certain of the Sellers were to receive their full consideration upon closing of the transaction, while others received cash up front plus the potential for future "Earnout" payments.[9] This dispute pertains to the Agreement's Earnout payment mechanism.

## 2. Payment of Earnouts under the Agreement

### a. Earnout calculation

As relevant here, Section 2.6 of the Agreement provided for three potential Earnout payments: one each at the end of fiscal years 2010, 2011, and 2012.[10] For each

---

[6]    Agreement, Preamble.

[7]    Skinner Aff. ¶ 5.

[8]    Agreement § 2.2.

[9]    *Id.*

[10]   *Id.* § 2.6. I note that the relevant fiscal years each span twelve months beginning in late November of the preceding calendar year, such that Fiscal Year 2010 is defined to run from November 30, 2009 to November 28, 2010; Fiscal Year 2011

3

of those years, the Agreement sets out defined "Target Revenue" figures. If, for example, Fiscal Year 2010 Revenue met or exceeded 2010 Target Revenue, Milliken would pay $2,333,333 million as an addition to the Purchase Price; if 2010 Revenue was below Target Revenue, the Agreement provides a formula for computing the "2010 Earnout Payment," which would amount to some dollar figure between $0 and the $2,333,333 maximum.[11]

The same computation is made to determine the 2011 Earnout Payment and the 2012 Earnout Payment.[12] With respect to Fiscal Years 2011 and 2012, however, the Agreement required Milliken to make additional payments in the form of the "2010-2011 Cumulative Earnout" and the "2010-2012 Cumulative Earnout," respectively. A payment was owed for the 2011 Cumulative Earnout if the sum of the 2010 Earnout Payment and the 2011 Earnout Payment was less than a certain threshold; that threshold itself was dependent on whether "2010-2011 Revenue" exceeded a certain minimum amount.[13] The same structure was used to compute the 2010-2012 Cumulative Earnout, except that the inputs included the 2010 Earnout Payment, the 2011 Earnout Payment, the 2010-2011 Cumulative Earnout, and the 2012 Earnout Payment, and the threshold against which

---

from November 29, 2010 to November 27, 2011; and Fiscal Year 2012 from November 28, 2011 to December 2, 2012. *Id.* § 1. Collectively, I refer to these three Fiscal Years as the "Earnout Period."

[11]    *Id.* § 2.6(a); *see also id.* § 1.

[12]    *Id.* §§ 2.6(b)(i), 2.6(c)(i).

[13]    *Id.* § 2.6(b)(ii).

4

those payments were measured was "2010-2012 Revenue."[14] The Cumulative Earnout payments for 2011 or 2012, if any, would be made in addition to the 2011 Earnout Payment and the 2012 Earnout Payment. The parties agreed that, in any event, the aggregate payment in respect of the three relevant calculations—(1) the 2010 Earnout Payment, (2) the 2011 Earnout Payment plus the 2010-2011 Cumulative Earnout, and (3) the 2012 Earnout Payment plus the 2010-2012 Cumulative Earnout—would not be greater than $7,000,000 or less than $0.[15]

### b. Earnout payments and disputes

While Sections 2.6(a) through (c) deal with Earnout calculations, Section 2.6(d) of the Agreement pertains to the payment of Earnouts and related disputes. It required Milliken to make the appropriate payments within 120 days after the end of the applicable Fiscal Year. Concurrent with the delivery of that payment, Milliken had to provide "the Sellers Representative" with "reasonably detailed calculations of the additional Purchase Price then due (the 'Earnout Calculations')."[16] Upon receipt of the Earnout Calculations, the Sellers Representative had thirty days to object to them by delivering a "Certificate of Earnout Dispute."[17] The Agreement defined that term as meaning "a Certificate of Earnout Dispute, substantially in the form of Exhibit 2.6(d), executed by the Sellers Representative and containing the information required

---

[14]     *Id*. § 2.6(c)(ii).

[15]     *Id*.

[16]     *Id*. § 2.6(d)(i).

[17]     *Id.* § 2.6(d)(ii).

5

therein."[18] The parties agreed that if the Sellers Representative did not object within the requisite 30-day period, the Earnout Calculations for that applicable Fiscal Year "shall be final and binding on the parties."[19]

If the Sellers Representative timely did deliver a Certificate of Earnout Dispute, however, the Agreement specifies a dispute resolution procedure that ultimately could lead to arbitration. After the Sellers Representative delivers a Certificate of Earnout Dispute, the parties agreed that they would "use their reasonable efforts to resolve by written agreement any differences related to the Certificate of Earnout Dispute."[20] If such a resolution could not be reached within thirty days of delivery of the Certificate of Earnout Dispute

> then Buyer [*i.e.*, Milliken] and Sellers Representative shall submit the objections that are then unresolved to an arbitrator who shall have at least 20 years of experience in the floor coverings industry (the "<u>Arbitrator</u>"). . . . Within fifteen (15) days after appointment of the Arbitrator, Buyer and the Sellers Representative shall each submit their respective written positions regarding the dispute to the Arbitrator and the other party. The Arbitrator shall conduct a hearing within thirty (30) days after appointment, and shall make an award within ten (10) days after the hearing. The Arbitrator shall be instructed by the parties to make an award that wholly adopts the position of either Buyer or the Sellers Representative, without any modification to either position. . . . Buyer and Sellers agree to be bound by the award of the Arbitrator.[21]

---

[18]     *Id.* § 1.

[19]     *Id.* § 2.6(d)(ii).

[20]     *Id.*

[21]     *Id.*

6

Aside from the delivery of a Certificate of Earnout Dispute in objection to the Earnout Calculations, the Agreement contemplated one other avenue by which the parties might arrive in Earnout-related arbitration. The parties agreed that "Buyer and Management Team will keep each other reasonably informed of the operations of the Acquired Companies."[22] The term "Management Team" referred to the "senior managers" of Product Concepts at the date of the closing.[23]

Based on this exchange of information with the Management Team, the Agreement provides that if Milliken "takes an action that would likely require an adjustment contemplated by the definition of Revenues, the Sellers Representative shall notify Buyer by delivering a Certificate of Earnout Dispute within thirty (30) days after such action is first taken."[24] Unless the Sellers Representative delivered a Certificate of Earnout Dispute within that 30-day period, no adjustment would be made to the definition of Revenues with respect to that particular action. If a Certificate of Earnout Dispute was timely delivered, the Agreement sets out the same arbitration structure as discussed above.

### 3. Dr. Weiner delivers a Certificate of Earnout Dispute

When the transaction closed, Milliken took control of Product Concepts, and Dr. Weiner, who had founded Product Concepts, became an employee of Milliken.[25] For

---

[22] *Id.* § 2.6(d)(iii).

[23] *Id.* § 1.

[24] *Id.* § 2.6(d)(iii).

[25] Aff. of Robert S. Weiner ("Weiner Aff.") ¶ 2.

7

purposes of the Agreement and its Earnout structure, Dr. Weiner was a member of the "Management Team" of Product Concepts throughout the entire Earnout Period.[26] In that capacity, he was entitled to receive information about the operation of the Acquired Companies, and he claims to have received numerous "Earnout Calculations and Projections" during this time.[27] According to Dr. Weiner, however, his position with Milliken involved no actual management responsibility or involvement in the decisionmaking with respect to Product Concepts.[28]

The Earnout payment mechanism apparently functioned well at the outset. Dr. Weiner had no objection to the 2010 Earnout Calculations when they were provided by Milliken.[29] Thereafter, however, disputes began to percolate. Dr. Weiner raised concerns with Milliken's management of the Acquired Companies, including decisions that adversely affected Product Concepts, and, from Dr. Weiner's perspective, were inconsistent with Milliken's representations before the execution of the Agreement.[30] Throughout 2011 and 2012, he objected to what he characterizes as "numerous, intentional steps to destroy '[Product Concept's] standalone value.'"[31] Specifically, the record includes email and written communications from Weiner to various employees at

---

[26]    Skinner Aff. ¶ 46.

[27]    Weiner Aff. ¶ 6.

[28]    *Id.* ¶ 18.

[29]    *Id.* ¶ 8.

[30]    *Id.* ¶ 19.

[31]    *Id.* ¶ 17.

8

Milliken, dated December 2, 2011, December 27, 2011, and April 30, 2012.[32] In those communications, he complains that key Product Concepts employees were dissatisfied with the new Milliken leadership and that certain product orders which should have shipped in late 2011 were delayed through Milliken's fault, which improperly depressed the Fiscal Year 2011 Earnout payment.[33]

Importantly, Dr. Weiner became the "Sellers Representative" for purposes of the Agreement during Fiscal Year 2011. Lineage Capital L.P. was the initial Sellers Representative and it was to remain in that role from the closing of the transaction on October 6, 2009 "until such time as no amount remains in the Escrow Fund."[34] Lineage Capital provided notice on May 31, 2011 that the applicable fund had been fully paid out, and Dr. Weiner became the Sellers Representative that day.[35]

Milliken does not deny that Dr. Weiner sent the email and written communications in 2011 and 2012 referenced above. Rather, it asserts that with respect to the Earnout Payment and Earnout Calculations it delivered at the end of Fiscal Year 2011, no "Certificate of Earnout Dispute" timely was provided in the form required by Section 2.6 of the Agreement.[36] Moreover, Milliken alleges that during the entire Earnout Period—*i.e.*, from October 6, 2009 through December 2, 2012—and for thirty days thereafter, "no

---

[32] *Id.* ¶ 9; *see also id.* Ex. C.

[33] *Id.*

[34] *Id.* § 1.

[35] Skinner Aff. ¶ 8.

[36] *Id.*

9

Sellers Representative ever delivered a Certificate of Earnout Dispute . . . to raise any issues about any actions taken by Milliken in operating the Acquired Companies during that time period or to seek any adjustment in the definition of Revenues" for purposes of the Earnout Calculations.[37]

With respect to the Earnout Calculation and payment for Fiscal Year 2012, by contrast, the parties agree that Dr. Weiner submitted a Certificate of Earnout Dispute (the "2013 CED") on April 26, 2013, within thirty days of Milliken's delivery of the 2012 Earnout Calculations.[38] The 2013 CED states that Dr. Weiner previously had "expressed objections, concerns, and disagreement with various policies that Milliken has employed . . . [which] have directly and adversely impacted the ability to maximize the Earnout."[39]

#### 4. The parties fail to agree on an Arbitrator

The parties attempted without success to resolve their differences concerning the objections reflected in the 2013 CED.[40] Pursuant to the Agreement, the next step was to "submit the objections that are then unresolved to an arbitrator who shall have at least 20 years of experience in the floor coverings industry (the 'Arbitrator')."[41] As relevant here, the Agreement further provides that, "[i]f the parties cannot agree on an arbitrator, Buyer

---

[37]    Skinner Aff. ¶ 47.

[38]    *Id.* ¶ 50; Weiner Aff. Ex. F.

[39]    Weiner Aff. Ex. F.

[40]    Compl. ¶ 14; Answer and Verified Counterclaims of Milliken Design, Inc. ("Counterclaims") ¶ 37.

[41]    Agreement § 2.6(d)(ii).

10

and the Sellers Representative shall each select one person who meets the arbitrator qualifications set forth above, and the two persons selected shall jointly select a person who meets the arbitrator qualifications set forth above, who shall be the 'Arbitrator.'"[42]

In early July 2013, Dr. Weiner proposed that Greg Colando serve as the "Arbitrator" under Section 2.6 of the Agreement. Colando is the founder and president of FLOR, a residential modular floor covering business.[43] Milliken refused to accept Colando, alleging that he is not qualified under Section 2.6 because he "is not and has never been an arbitrator in the past," and because Milliken "believes Mr. Colando is biased in favor of Weiner and against Milliken," making him unable to serve as "a fair and impartial decision maker."[44] Milliken proposed two alternate arbitrators, each of whom Dr. Weiner rejected as lacking "at least 20 years of experience in the floor coverings industry," and therefore unqualified.[45] Milliken proposed a third potential arbitrator, Christopher L. Glanville, on February 14, 2014. Dr. Weiner also considered Glanville to be unqualified, but reserved his objections on the basis that Glanville's involvement would be limited to conferring with Colando to select an Arbitrator and allow the process to proceed.[46] To date, the parties and their respective arbitrator candidates have not been able to agree on the selection of an Arbitrator.

---

[42] *Id.*

[43] Compl. ¶¶ 16-17.

[44] Counterclaims ¶ 39.

[45] Compl. ¶ 20.

[46] Compl. ¶¶ 27-32.

11

## C.      Procedural History

On January 14, 2014, Dr. Weiner filed an Application to Compel Arbitration in the Superior Court of Fulton County, Georgia (the "Georgia Action"). Milliken moved to dismiss that action on April 10, contending that Section 7.8 of the Agreement included a forum selection provision mandating that the claims be litigated in Delaware. On May 19, after opposing Milliken's motion to dismiss the Georgia Action, Dr. Weiner filed his Complaint in this Court. Milliken filed its Answer and Counterclaims in this action on June 17. Shortly thereafter, Dr. Weiner moved to dismiss his own Complaint in this case, and then moved to dismiss or stay Milliken's Counterclaims in favor of the Georgia Action. Milliken moved to expedite this action and for a preliminary injunction barring Dr. Weiner from prosecuting the Georgia Action.

On August 13, 2014, I granted Milliken's motion and enjoined the parties from continuing to litigate their claims in the Georgia Action.[47] Both parties moved for summary judgment on their claims in this action. Each of the motions was fully briefed,[48] and I heard argument on October 15.[49] This Memorandum Opinion reflects my rulings on the cross motions.

---

[47]     Prelim. Inj. Arg. Tr. 46.

[48]     Briefing consisted of an opening, answering, and reply brief for each motion. In terms of Milliken's motion for summary judgment, the briefs are cited as follows: "Milliken Opening Br.," "Weiner Answering Br.," and "Milliken Reply Br." As to Plaintiff, Weiner's, motion, the briefs are cited as: "Weiner Opening Br.," "Milliken Answering Br.," and "Weiner Reply Br."

[49]     Arg. Tr.

12

### D. Parties' Contentions

Weiner and Milliken agree that their next step is arbitration, but they disagree about the scope of the properly arbitrable dispute and about who should serve as the Arbitrator. Weiner's Complaint seeks an order compelling arbitration of the Earnout dispute. Weiner would attempt to persuade the Arbitrator to consider alleged breaches of the Agreement during 2010 and 2011 in making the arbitral decision and award. In that regard, Weiner argues that Section 2.6(d) "clearly applies to earnout disputes . . . and adjustments to Revenue based on management decisions."[50] Milliken's Counterclaim seeks an order enjoining the parties from arbitrating any claim concerning the 2010 or 2011 Earnout Calculations, arguing that by operation of Section 2.6(d), those calculations and the related payments were rendered "final and binding" after the requisite time period expired without the Sellers Representative properly submitting a Certificate of Earnout Dispute.[51] In response, Weiner contends that Milliken's argument about the "final and binding" language of Section 2.6(d) is an issue of procedural arbitrability, and therefore must be decided by the arbitrator, not the Court.

On the issue of identifying the Arbitrator, Weiner and Milliken proffer different interpretations of the provision in Section 2.6 that requires the parties to submit an unresolved Earnout dispute to "an arbitrator who shall have at least 20 years of

---

[50] Weiner Opening Br. 15; Weiner Answering Br. 8.

[51] Milliken Opening Br. 30-32.

experience in the floor coverings industry." Because the parties have reached an impasse on the selection of the Arbitrator, they agree that the Court must select one for them.

## II.    ANALYSIS

### A.    Legal Standard

"Summary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[52] When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[53] Summary judgment will be denied when the legal question presented needs to be assessed in the "more highly textured factual setting of a trial."[54] The Court also "maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application."[55] Pursuant to Court of Chancery Rule 56(h), where the parties have filed cross motions for summary judgment and "have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be

---

[52]    *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[53]    *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

[54]    *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n.3 (Del. Ch. 1987) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948)).

[55]    *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006) (quoting *Cooke v. Oolie,* 2000 WL 710199, at *11 (Del. Ch. May 24, 2000)).

the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." That is the situation here.

## B. The Scope of the Arbitrable Dispute

In analyzing issues concerning the proper scope and enforcement of the Agreement's arbitration provision, I am guided by the Federal Arbitration Act ("FAA") and the principles of law and equity consistent therewith.[56] Delaware courts will compel a party to arbitrate only if the contract "reflect[s] that the parties clearly and intentionally bargained for whether and how to arbitrate."[57] That threshold question of whether the parties agreed to arbitrate, commonly referred to as "substantive arbitrability," is presumptively an issue for resolution by this Court, while "procedural arbitrability" questions, on the other hand, are decided by the arbitrator.[58] Neither Weiner nor Milliken contend that the arbitrator, rather than this Court, should decide substantive arbitrability.[59] Thus, this situation does not implicate cases like *James & Jackson, LLC*

---

[56]   10 *Del. C.* § 5702(c) ("Unless an arbitration agreement complies with the standard set forth in subsection (a) of this section for the applicability of the Delaware Uniform Arbitration Act, any application to the Court of Chancery to enjoin or stay an arbitration, obtain an order requiring arbitration, or to vacate or enforce an arbitrator's award shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act, and such general principles of law and equity as are not inconsistent with that Act.").

[57]   *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010).

[58]   *Viacom Int'l, Inc. v. Winshall*, 72 A.3d 78, 82 (Del. 2013).

[59]   *E.g.*, Milliken Opening Br. 36 ("This Court must determine substantive arbitrability."); Weiner Answering Br. 7 ("Dr. Weiner and Milliken agree that the Agreement includes a narrow arbitration provision, and that substantive arbitrability is to be decided by this Court.").

15

*v. Willie Gary*, which hold that where there is "clear and unmistakable evidence" that the parties agreed to submit the issue of substantive arbitrability to the arbitrator, the courts should defer to that manifestation of intent.[60]

While the parties agree that "substantive arbitrability" is a question for me to decide, they disagree as to what aspects of this dispute are substantively arbitrable. Milliken concedes that the 2013 Certificate of Earnout Dispute conforms with the requirements of Section 2.6(d), and should be submitted to arbitration.[61] Milliken insists, however, that Weiner has "no arbitrable claim concerning the Fiscal Year 2010 or Fiscal Year 2011 Earnout Calculations" because the operation of Section 2.6 has rendered those items "final and binding."[62] Milliken contends further that Weiner has no arbitrable claims concerning "any adjustment in the definition of Revenues to be used in calculating any Fiscal Year Earnout Payment based on any actions taken by Milliken in the operation of the Acquired Companies," because no Sellers Representative delivered a Certificate of Earnout Dispute raising an objection to actions taken by Milliken during the relevant time period.[63] For those reasons, Milliken's Counterclaim seeks a declaration that claims pertaining to the Fiscal Year 2010 and Fiscal Year 2011 Earnout Calculations, or to the management actions during the relevant time period that may have affected "Revenue"

---

[60]   *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

[61]   Milliken Opening Br. 36 ("Weiner cannot provide this Court with any other Certificate of Earnout Dispute delivered to Sim Skinner and George Miller. The 2013 CED is the only one.").

[62]   *Id.*

[63]   *Id.* at 35-36.

under Section 2.6(d)(iii), are not substantively arbitrable, because the contractually specified method of teeing those claims up for arbitration was not followed, and the related Earnout Calculations therefore are "final and binding" upon the parties.

Weiner concedes that with respect to Fiscal Year 2010, there was no objection, and that the main disagreement is whether the Fiscal Year 2011 Earnout Calculations are properly part of the arbitrable dispute.[64] In this regard, Weiner contends that he objected multiple times to Milliken's Earnout Calculations and its operation of the Acquired Companies. He contends, therefore, that Milliken's arguments about certain aspects of their Earnout dispute being not "substantively" arbitrable are actually arguments that address procedural arbitrability—issues that must be decided by the arbitrator.[65] Weiner also responds that, insofar as Milliken agrees that the Fiscal Year 2012 Earnout Calculation was properly disputed in the 2013 CED, that Calculation includes a 2010-2012 Cumulative Earnout calculation, thus "requir[ing] that the 2010 Earnout Calculation be revisited for purpose of calculating the 2011 Earnout Calculation, and that both the 2010 and 2011 Earnout Calculations be revisited for the 2012 Earnout Calculation."[66] By Weiner's reasoning, the 2013 CED includes his objections to the 2010-2011 Cumulative

---

[64] Arg. Tr. 9-10.

[65] Weiner Answering Br. 7-11.

[66] *Id.* at 13.

Earnout payments, and "objections to management decisions that adversely affected the Earnout,"[67] and all of those issues should be put to the arbitrator.

In its recent *Viacom International, Inc. v. Winshall*[68] decision, the Delaware Supreme Court discussed at length the distinction between substantive and procedural arbitrability. The Court stated:

> Issues of substantive arbitrability are gateway questions relating to the scope of an arbitration provision and its applicability to a given dispute, and are presumptively decided by the court. Procedural arbitrability issues concern whether the parties have complied with the terms of an arbitration provision, and are presumptively handled by arbitrators. These issues include whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability.[69]

Like this case, *Viacom International* involved the calculation and payment of post-closing earnout payments between parties to a merger contract. In reaching its conclusion, the Supreme Court discussed two other cases that also dealt with post-closing price adjustments, *HDS Investment Holdings, Inc. v. Home Depot, Inc.*[70] and *Nash v. Dayton Superior Corp.*[71] In *HDS Investment Holdings*, the relevant agreement provided

---

[67]     *Id.* at 14.

[68]     72 A.3d 78 (Del. 2013).

[69]     *Id.* at 82.

[70]     2008 WL 4606262 (Del. Ch. Oct. 17, 2008), *abrogated by Viacom Int'l, Inc.*, 72 A.3d at 83-84.

[71]     728 A.2d 59 (Del. Ch. 1998), *abrogated by Viacom Int'l, Inc.*, 72 A.3d at 83-84.

18

for arbitration of certain disputes relating to a post-closing price adjustment based on the extent to which the target company's current assets exceeded its current liabilities.[72] When the acquiring company sued for a declaration that certain post-closing disputes between the companies were not arbitrable, this Court agreed in part, refusing to send to the arbitrator certain disputes that it concluded had arisen from other sections of the agreement and were "outside the scope of the arbitration provision."[73] Similarly, in *Nash*, this Court distinguished among several claims relating to the post-closing price adjustments under the relevant agreement, finding that at least some were "clearly arbitrable" while others were not.[74]

The posture of the *Viacom International* case was slightly different. The relevant decision there was not whether to submit certain claims arising from an agreement to arbitration, but whether an already-rendered arbitral decision and award should be vacated as erroneous under the FAA.[75] In affirming the Court of Chancery's decision not to vacate the arbitral award in *Viacom International*, the Supreme Court instructed that:

> Decisions like *HDS* and *Nash* misconstrue the distinction between procedural and substantive arbitrability. Whether an arbitration provision is branded "narrow" or "broad," the only question that the court should decide is whether the subject matter in dispute falls within it. If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of

---

[72]   2008 WL 4606262, at *2.

[73]   *Id*. at *6-8.

[74]   728 A.2d at 63-64.

[75]   *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *8-11 (Del. Ch. Aug. 9, 2012), *aff'd*, *Viacom Int'l, Inc.*, 72 A.3d 78 (Del. 2013).

19

working capital, or the company's net worth at closing, all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator. In resolving those issues, the arbitrator may well rely on the terms of the underlying agreement, and the arbitrator's interpretation of the contract is likely to affect the scope of the arbitration. Nonetheless, those decisions fall within the category of procedural arbitrability. They are not "gateway" issues about whether the particular dispute should be arbitrated at all. Rather, they are questions about how the subject of the arbitration should be decided.[76]

With these principles in mind, I conclude that, by seeking a declaration that Weiner has no arbitrable claims concerning the Fiscal Year 2010 Earnout Calculations, the Fiscal Year 2011 Earnout Calculations, or the adjustment of "Revenues" based on Milliken's actions in operating the Acquired Companies, Milliken is asking this Court to decide issues of procedural arbitrability. Section 2.6(d) of the Agreement clearly provides for arbitration of unresolved disputes that arise in the process of the calculation and payment of the Earnouts. The fact that Section 2.6(d) also delineates the procedural mechanism for perfecting such a "dispute" and presenting it to the arbitrator does not transform the procedural and formal requirements of that provision into "gateway questions" of substantive arbitrability. The parts of Section 2.6(d) that Milliken highlights provide the arbitrator with guidelines for "how the subject of the arbitration should be decided." Although their interpretation may be "likely to affect the scope of the arbitration," the Supreme Court has made clear that the only question this Court should decide is "whether the subject matter of the dispute"—here, the Fiscal Year 2010

---

[76] 72 A.3d at 83-84.

Earnout Calculation, Fiscal Year 2011 Earnout Calculation, and the related definitions of "Revenue" that were inputs in the various Earnout calculations—falls within Section 2.6(d)'s arbitration provision. I conclude that they do, especially insofar as those inputs and calculations are encompassed by the issues Weiner identified in the 2013 CED.

The facts Milliken relies on—including the failure of any Sellers Representative to deliver a formally compliant Certificate of Earnout Dispute with respect to Fiscal Years 2010 and 2011 and the effect of the Agreement's "final and binding" language in that regard—are "procedural questions that grow out of the dispute and bear on its final disposition" that "should be left to the arbitrator."[77] Each of Milliken's arguments in this regard conceivably has merit, and Milliken may advance them in its "written position[] regarding the dispute."[78] Milliken effectively asks, however, that this Court send the 2013 CED to arbitration, but preemptively curtail the scope of the arbitrator's analysis by limiting what financial metrics and inputs he may consider in rendering his arbitral decision. In so doing, Milliken invites a needlessly bifurcated adjudication of the issues in this dispute. As this Court stated in *Viacom International*, accepting the argument "that the question of what subsidiary issues were properly presented . . . in order for [the arbitrator] to make the ultimate decision about the Earn-Outs was one of substantive

---

[77]   *Viacom Int'l, Inc.*, 2012 WL 3249620, at *15 (internal quotation marks omitted) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964)).

[78]   Agreement § 2.6(d).

21

arbitrability would be entirely inconsistent with the efficiency purpose behind arbitration, and the policies of the FAA in supporting the use of arbitration."[79]

In arguing for a contrary conclusion, Milliken relies on *Avnet, Inc. v. H.I.G. Source, Inc.*[80] and *AHS New Mexico Holdings, Inc. v. Healthsource, Inc.*[81] In *Avnet, Inc.*, this Court ruled that a claim relating to a post-closing purchase price adjustment did not fall within the arbitration provision of the relevant agreement in part because the provision was ambiguous, and in part because the party seeking arbitration of that claim had submitted notice of its claim after the contractually specified time limit for such claims had lapsed.[82] This Court refused to compel arbitration of the claim, concluding that the issue was one of substantive arbitrability and therefore not one for the arbitrator to decide.[83] Even assuming that this case is materially similar to *Avnet*, that decision, which preceded *Viacom International*, relied on *Nash* and *HDS Holdings*, which the Delaware Supreme Court expressly abrogated in *Viacom*. In any event, this case differs from *Avnet* because the dispute here clearly falls within the scope of Section 2.6(d), as evidenced, at a minimum, by the parties' mutual recognition that the 2013 CED is properly arbitrable.

---

[79]     *Viacom Int'l, Inc.*, 2012 WL 3249620, at *14.

[80]     2010 WL 3787581 (Del. Ch. Sept. 29, 2010).

[81]     2007 WL 431051 (Del. Ch. Feb. 2, 2007).

[82]     *Avnet, Inc.*, 2010 WL 3787581, at *6.

[83]     *Id*. at *11.

The decision in *AHS New Mexico Holdings, Inc. v. Healthsource, Inc.* is similarly unhelpful to Milliken's position. Along with *Nash* and *HDS Holdings*, *AHS* was cited as supporting the conclusion in *Avnet*.[84] As I just noted, however, the continued vitality of that line of reasoning is dubious in light of *Viacom International*. *AHS* also differs from this case because there, this Court denied the defendant's cross motion for summary judgment, which sought to limit the scope of the dispute being submitted to arbitration, on the basis that there remained a genuine issue of material fact as to whether the parties actually agreed to limit the arbitrable issues in the manner suggested by the defendant.[85] No such issue of fact exists in this case. Thus, to the extent Milliken invokes *Avnet* and *AHS* as support for limiting the arbitrator's ability to decide what financial or other information should be considered in performing the subject calculations, or whether Weiner has complied with the requirements of Section 2.6(d), I consider that argument unavailing in light of *Viacom International*. Accordingly, Milliken's motion for summary judgment on its Counterclaims is denied, and Weiner's cross motion to compel arbitration of this dispute is granted.

## C.     Selecting the Arbitrator

In Section 2.6(d), the parties agreed that they would submit their dispute "to an arbitrator who shall have at least 20 years of experience in the floor coverings industry." They now disagree as to the meaning of that provision. Milliken contends that by using

---

[84]     *Compare Avnet, Inc.*, 2010 WL 3787581, at *9, *with Viacom Int'l, Inc.*, 72 A.3d at 82.

[85]     *AHS New Mexico Hldgs., Inc.*, 2007 WL 431051, at *8-9.

23

the word "arbitrator" in this regard, the parties "made clear that not just any person could be selected, but instead an arbitrator—someone who routinely serves as an arbitrator of disputes on a professional basis—must be selected."[86]  According to Milliken, the added requirement of "at least 20 years of experience in the floor coverings industry" is an additional qualification that further modifies the term "arbitrator."  Weiner, on the other hand, denies that the term "arbitrator" means "experienced arbitrator" or "professional arbitrator" or something similar.

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[87]  While the drafting of this portion of Section 2.6(d) leaves something to be desired, I do not find the provision ambiguous, because Milliken's proposed reading of it is not reasonable.[88]  If the parties had desired, as Milliken argues, to require "someone who routinely serves as an arbitrator of disputes on a professional basis," they easily could have done so by including a word like "experienced" or "professional" or by making reference to organizations like the American Arbitration

---

[86]     Milliken Opening Br. 38.

[87]     *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[88]     *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) ("When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous.").

24

Association or Judicial Arbitration and Mediation Services (JAMS). They did not, however, and as a result, I do not read the disputed language of Section 2.6(d) as placing minimum qualifications or credentials in terms of whether the chosen arbitrator has to be a person who regularly conducts arbitrations or serves as a third-party neutral in these types of disputes. Rather, the Agreement requires that the chosen arbitrator have at least 20 years of experience in the floor coverings industry. Therefore, in selecting the arbitrator, I will not limit the field of candidates to "experienced" or "professional" arbitrators.

I do not agree, however, with the suggestion, which Milliken ascribes to Weiner, that the parties contracted away their right to an impartial adjudicator.[89] In this regard, I draw from both the FAA and Delaware case law. As noted earlier, the FAA applies where, as here, the parties did not expressly adopt the Delaware Uniform Arbitration Act ("DUAA") as the governing statute with respect to their arbitration agreement. The FAA empowers federal district courts to vacate an arbitral award "where there was evident partiality or corruption in the arbitrators."[90] Had the DUAA applied, a similar provision would govern.[91] It is clear, therefore, that an irreducible level of impartiality must exist

---

[89]     *See* Weiner Opening Br. 12 ("Milliken [w]aived any claim that someone with at least 20 years of experience in the floor coverings industry should be disqualified by virtue of having knowledge of or dealings with either or both of the parties.").

[90]     9 U.S.C.A. § 10 (West 2014).

[91]     10 *Del. C.* § 5714(a)(2) ("[T]he Court shall vacate an [arbitral] award where . . . There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party.").

25

in arbitration proceedings, and any arbitrator who is not impartial will be unable to preside over this dispute. In terms of how courts decide whether an arbitrator lacks the requisite impartiality under these statutes, the Delaware Supreme Court has held that, "[T]o demonstrate evident partiality sufficient to require vacatur, [t]he record must reflect that an arbitrator failed to disclose a substantial personal or financial relationship with a party, a party's agent, or a party's attorney that a reasonable person would conclude was powerfully suggestive of bias."[92] Thus, in selecting an arbitrator for this dispute, I will avoid any potential arbitrator candidate with whom either of the parties or their agents has a substantial personal or financial relationship "powerfully suggestive of bias."

With those guiding principles in mind, the parties are directed to submit up to three arbitrator candidates, along with brief statements demonstrating their qualifications based on the parameters just discussed.

## III. CONCLUSION

For the foregoing reasons, Defendant Milliken's motion for summary judgment is denied. Plaintiff Weiner's motion for summary judgment is granted to the extent it seeks to compel arbitration under Section 2.6(d) of the Agreement. Each of the parties also is directed to submit a list of up to three potential arbitrator candidates in accordance with the discussion herein within twenty (20) days of the date of this Memorandum Opinion.

**IT IS SO ORDERED**.

---

[92] *Del. Transit Corp. v. Amalgamated Transit Union Local 842*, 34 A.3d 1064, 1072 (Del. 2011) (citing *Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp.*, 751 A.2d 426, 435 (Del. Ch. 1999)).